IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JEROME BUFFALOHEAD,

      **Plaintiff,**

      v.                              CASE NO. 24-3035-JWL

KEVIN COOK, et al.,

      **Defendants.**

## MEMORANDUM AND ORDER

      Plaintiff brings this pro se civil rights action under 42 U.S.C. § 1983. Although Plaintiff is currently incarcerated at the Norton Correctional Facility in Norton, Kansas, his claims arose during his incarceration at the Lansing Correctional Facility in Lansing, Kansas ("LCF"). The Court granted Plaintiff leave to proceed in forma pauperis. On April 1, 2024, the Court entered a Memorandum and Order (Doc. 5) ("M&O") finding that the proper processing of Plaintiff's claims could not be achieved without additional information from appropriate KDOC officials. *See Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978); *see also Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991). Accordingly, the Court ordered KDOC officials to prepare and file a *Martinez* Report. The Court's M&O provides that "[o]nce the Report has been received, the Court can properly screen Plaintiff's Complaint under 28 U.S.C. § 1915A." (Doc. 5, at 6.) The *Martinez* Report (Doc. 10) (the "Report") has now been filed. The Court's screening standards are set forth in the Court's M&O.

## I. Nature of the Matter before the Court

      Plaintiff alleges an Eighth Amendment violation based on a failure to protect him. He claims that on July 15, 2022, CO Cook intentionally opened Plaintiff's cell door and allowed two inmates to "horrendously attack [him], at the time the cellhouse was on lockdown." (Doc. 1, at

2, 4.)   Plaintiff was stabbed nine times, received puncture wounds to his lung, neck, and several other areas, and was transported to the hospital. *Id*. at 4.

Plaintiff alleges that at the time of the stabbing, no one was supposed to be outside of their cell. *Id*. at 2.  Plaintiff asserts that due to the lockdown, "it was virtually impossible for two inmates to effect such an attack without the assistance of the officer." *Id*. at 4.

Plaintiff alleges that upon his return from the hospital, he did not receive any misconduct reports for fighting or for being "out of place." *Id*.  He claims that CSI Kincaid investigated the matter and the investigating officer's report is erroneous and false, and was an "effort[] to cover for his cohorts" and to hinder Plaintiff's litigation.  *Id*. at 2, 4, 5.  Plaintiff alleges that he requested the camera footage and that EAI Gift witnessed the video tape and attested to the fact that the information presented in the investigating officer's report is erroneous and false. *Id*. at 4.

Plaintiff alleges that although Kincaid stated on the record that Plaintiff suffered no mental or emotional injury from the attack, Plaintiff was not seeing the mental health providers prior to the incident and now suffers from PTSD. *Id*. at 5.  Plaintiff alleges that Kincaid's baseless assumption was not supported by a mental health assessment. *Id*.

Plaintiff names as defendants:  Kevin Cook, Correctional Officer ("CO") at LCF; and (fnu) Kincaid, CSI Investigator at LCF. Plaintiff seeks compensatory, punitive, and nominal damages.  *Id*. at 7.  Plaintiff claims a failure to protect in violation of the Eighth Amendment, supervisor liability, and conspiracy.

Plaintiff attaches his grievances and responses to his grievances.  (Doc. 1–1.)  Staff responded to Plaintiff's request to save the video of the incident, stating that "[i]t has already been saved."  *Id*. at 15.  Plaintiff attaches a June 28, 2023 response from Corrections Manager Darcie Holthaus that states:

> The initial review by CSI Kincaid, he did not find any staff negligence resulting in the harm done to you.
>
> In reviewing the initial report by CSI Kincaid, we did find an error in him identifying the wrong victim, as this event led to a chaotic scene with multiple people being involved and/or injured. In the interview with Officer Cook it is clear he was attempting to gain control of the unit and instructing people to lock down. He was opening cell doors in an attempt to give individuals access to their cells in order to comply with his lock down directives. The officer had no intention of allowing harm to come to you or any other resident in the unit that day.
>
> You were given immediate and adequate medical attention. You were given proper medical follow-up care for your injuries, none of which were life-threatening. You have also been and continue to be encouraged to meet with Behavioral Health staff to help you with any mental health issues you may be experiencing.

*Id*. at 18. Plaintiff also attaches CSI Kincaid's August 23, 2022 response that states:

> In the process of investigating this claim, I reviewed applicable cameras and found that your claim that CO1 Cook allowed offenders into your room were [sic] false. You were out in the unit wondering [sic] and were attacked on the second floor around Cell 227 and you lived in A-3 103. I got a statement from the Health Service administrator that "the resident did receive multiple stab wounds on the date of 7/15/2022, most of which were relatively minor. The mental health claim is not accurate. The resident requested psychiatry and psychiatric medications beginning 4/11/2022 for circumstances unrelated to and prior to the aforementioned attack." Since the claims that the [sic] CO1 Cook allowed offenders into your room were found to be fabricated and that mental health services were sought before the attack and not as a result and there is no documented permanent damage from incident, I am recommending this claim be denied.

*Id*. at 23.

## II. The Report

The Report provides as follows:

> 1. On July 15, 2022, at approximately 06:38 p.m., Defendant Kevin Cook unlocked cell 101 in the A3 pod, where Plaintiff and his cellmate were housed, and then he walked away to the officer's station. *See* Exhibit D.

3

2. A few seconds later, two inmates entered the cell, and Plaintiff was attacked. *See* Exhibit D.

3. A medical emergency was called by Defendant Kevin Cook and Buffalohead was subsequently taken to the clinic where he received medical treatment. *See* Exhibit B, ¶ 9.

4. Shortly after arriving at the clinic, Plaintiff was transferred to the University of Kansas Health System. At 08:40 p.m., Plaintiff underwent a Limited Abdominal Ultrasound which identified four areas of penetration on his back and that one of his ribs sustained a mildly displaced fracture. *See* Exhibit E, p. 1.

5. The next day, July 16, 2022, Plaintiff was prescribed pain medication and was discharged from the hospital. He was instructed to maintain activity, resume a regular diet, and to keep the wounds clean and dry. *See* Exhibit E, p. 2 & 4.[1]

6. On July 20, 2022, Plaintiff underwent a behavioral health checkup, wherein he reported no behavioral health issues, thought or mood disturbances, or distress. *See* Exhibit E, p. 5.[2]

7. On August 1, 2022, Plaintiff was seen again by behavioral health and reported no anxiety, depression, or symptoms of PTSD. *See* Exhibit E, p. 20.

8. On August 4, 2022, the Plaintiff initiated a personal injury claim, seeking $500,000 in damages. The claim cited physical injuries sustained during the incident, alongside a claim of PTSD, allegedly resulting from the same attack. However, that claim was denied because it was untimely, and the requested amount exceeded the allowable limit. (Doc. 1[-1], at 18 and 22).

9. Nevertheless, an investigation was conducted by CSI Kincaid due to the allegation of possible staff misconduct. *Id.* at 23.

10. During CSI Kincaid's investigation, he mistakenly reviewed security camera footage of an incident which occurred moments after Buffalohead's stabbing in which residents on the second floor of Pod A3 attempted to take control of their unit. *See* Exhibit [C], ¶ 7.

11. Kincaid incorrectly stated: "I reviewed applicable cameras and found that your claim that COI Cook allowed offenders into your room were false. You were out in the unit wondering and were attacked on the second floor around Cell 227 and you lived in A-3 103." (Doc. [1–1, at 23]).

12. The secretary of corrections launched an investigation following CSI Kincaid's error which corroborated and supported his findings. *Id.* [at 18].

13. The secretary acknowledged that Kincaid's misidentification of Buffalohead was attributed to the chaotic scene that resulted from

---

[1] *See* pages 2–5.
[2] The relevant medical record is on page 9.

4

> the separate incident, as multiple people were involved and/or injured. *Id.*
> 14. The secretary also stated in his findings that it is clear that "[Cook] was attempting to gain control of the unit and instructing people to lock down. He was opening cell doors in an attempt to give individuals access to their cells in order to comply with his lock down directives. The officer had no intention of allowing harm to come to [Buffalohead] or any other resident in the unit that day." *Id.*
> 15. Kevin Cook further affirms that he unlocked cell 101 in response to a request from a resident whom he believed resided in that cell. His intent was to regain control of the unit by directing residents to lockdown in their respective cells. *See* Exhibit B, ¶ 13.
> 16. Cook states, "While I was doing a Security Check, I had a Resident come up to me and said, 'C O, can you open 101 for me?' I asked why and he said, 'I just came back from Call-Out and need to grab my shower stuff so I can take a Shower.'" *See* Exhibit B, ¶ 7.
> 17. On August 8, 2022, 6 days after filing the personal injury complaint, Plaintiff reported experiencing anxiety and fear related to the attack. Plaintiff was prescribed Zoloft to address anxiety. *See* Exhibit E, p. 32.[3]
> 18. On August 17, 2022, Plaintiff was placed on Crisis Level due to expressing fear that people were trying to get him and that his life was in danger. *See* Exhibit E, p. 45 & 48.
> 19. On August 22, 2022, LCF's Health Services Administrator submitted a response to Plaintiff's personal injury claim. *See* Exhibit F, p. 1.
> 20. On August 30, 2022, Plaintiff first reported PTSD symptoms such as flashbacks, insomnia, paranoia, and hypervigilance during a routine behavioral health appointment. *See* Exhibit E, p. 127.[4]

(Doc. 10, at 3–6.)

## III. DISCUSSION

Plaintiff alleges that Defendants failed to protect him by opening his cell door to allow other inmates into his cell, and falsified the investigative report regarding the incident. "[P]rison officials have a duty to 'provide humane conditions of confinement,' including 'tak[ing]

---

[3] The record shows an encounter date of August 10, 2022, and does not mention Zoloft.
[4] Although the Report indicates that Plaintiff "first" reported PTSD on August 30, 2022, the August 10, 2022 encounter referenced in ¶ 17 above provides that Plaintiff "stated that he might need to look into medication options when getting to Eldorado because of PTSD symptoms he is experiencing." Exhibit E, at 32.

5

reasonable measures to guarantee the safety of . . . inmates.'" *Hooks v. Atoki*, 983 F.3d 1193, 1205 (10th Cir. Dec. 29, 2020) (quoting *Requena v. Roberts*, 893 F.3d 1195, 1214 (10th Cir. 2018) (alteration and omission in original) (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). This duty includes "a duty to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (ellipsis and quotation marks omitted).

A claim of deliberate indifference requires a plaintiff to allege "that an official acted (or failed to act) in an objectively unreasonable manner and with subjective awareness of the risk." *Strain v. Regalado*, 977 F.3d 984, 987 (10th Cir. 2020) (noting that "the word deliberate makes a subjective component inherent in the claim"). Plaintiff must "establish that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 990 (citations and alteration omitted).

"[A]n official's intent matters not only as to what the official did (or failed to do), but also why the official did it." *Id*. at 1204 (citing *Strain*, 977 F.3d at 993). The official's response to the risk is also a consideration. *See id*. at 1205 (citing *Farmer*, 511 U.S. at 844 (explaining that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted")).

Plaintiff alleges that CO Cook "intentionally open[ed] [Plaintiff's] cell door and allowed inmates to horrendously attack [Plaintiff] at the time the cellhouse was on lock down." (Doc. 1, at 2.) Plaintiff also alleges that Kincaid's report "is erroneous and false within efforts to cover for his cohorts." *Id*. at 4. In support of this allegation that the investigative report was a coverup, Plaintiff states that he "never received any misconduct reports" despite the report

indicating he was out "wondering" on a different floor. *Id*. at 5.

The Report disputes Plaintiff's claims and suggests that Defendants acted, at most, negligently. *See* Doc. 10, at 6–7 (noting that Plaintiff's Pod is permanently on lockdown due to the heightened security risks of the residents in the unit; residents are restricted to their cells unless given approval to exit; a resident asked Cook to unlock a cell which the inmate claimed ownership of; Cook was not familiar with either resident at the time; and Cook unlocked the cell then walked away to his post). The Report also claims that although CS1 Kincaid mistakenly identified the wrong resident on camera, a subsequent investigation by the secretary of corrections confirmed that the Defendants did not act inappropriately. *Id*. at 7.

The Court recognizes that the Report disputes Plaintiff's contentions that the Defendants' actions were done deliberately and intentionally. The *Martinez* report developed as a means "to ascertain whether there is a factual as well as a legal basis for [a] prisoner's claims." *Gee v. Estes*, 829 F.2d 1005, 1007 (10th Cir. 1987). The report "is treated like an affidavit, and the court is not authorized to accept the factual findings of the prison investigation when the plaintiff has presented conflicting evidence." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (citation omitted). The Court "cannot resolve material disputed factual issues by accepting the report's factual findings when they are in conflict with pleadings or affidavits." *Id*. at 1109. "Furthermore, '[a] bona fide factual dispute exists even when the plaintiff's factual allegations that are in conflict with the *Martinez* Report are less specific or well-documented than those contained in the report.'" *Bellamy v. Kansas*, 2024 WL 3718065, at n.5 (10th Cir. Aug. 8, 2024) (unpublished) (quoting *Hall*, 935 F.2d at 1109).

The Court is unable to resolve the factual disputes at this stage of the proceedings and finds that this case survives screening under 28 U.S.C. § 1915A.

**IV. Motion to Appoint Counsel**

Plaintiff has filed a motion to appoint counsel (Doc. 14). Plaintiff alleges that he has no understanding of the law and used a jailhouse lawyer to assist him in drafting his Complaint. (Doc. 14, at 1.) Plaintiff alleges that he has a 10th-grade education, and the issues are complex and will require discovery. *Id*. at 2. Plaintiff alleges that he needs counsel to obtain KDOC polices and his medical records from the outside hospital. *Id*. at 3.

The Court has considered Plaintiff's motion for appointment of counsel. There is no constitutional right to appointment of counsel in a civil case. *Durre v. Dempsey*, 869 F.2d 543, 547 (10th Cir. 1989); *Carper v. DeLand*, 54 F.3d 613, 616 (10th Cir. 1995). The decision whether to appoint counsel in a civil matter lies in the discretion of the district court. *Williams v. Meese*, 926 F.2d 994, 996 (10th Cir. 1991). "The burden is on the applicant to convince the court that there is sufficient merit to his claim to warrant the appointment of counsel." *Steffey v. Orman*, 461 F.3d 1218, 1223 (10th Cir. 2006) (quoting *Hill v. SmithKline Beecham Corp.*, 393 F.3d 1111, 1115 (10th Cir. 2004)). It is not enough "that having counsel appointed would have assisted [the prisoner] in presenting his strongest possible case, [as] the same could be said in any case." *Steffey*, 461 F.3d at 1223 (quoting *Rucks v. Boergermann*, 57 F.3d 978, 979 (10th Cir. 1995)).

In deciding whether to appoint counsel, courts must evaluate "the merits of a prisoner's claims, the nature and complexity of the factual and legal issues, and the prisoner's ability to investigate the facts and present his claims." *Hill*, 393 F.3d at 1115 (citing *Rucks*, 57 F.3d at 979). The Court concludes in this case that (1) the issues are not complex; and (2) Plaintiff appears capable of adequately presenting facts and arguments. The Court denies the motion without prejudice to refiling the motion at a later stage of the proceedings.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff's motion to appoint counsel (Doc. 14) is **denied without prejudice.**

**IT IS FURTHER ORDERED** that Plaintiff's claims survive the Court's screening under 28 U.S.C. § 1915A.

**IT IS FURTHER ORDERED** that the Defendants shall have until **November 15, 2024,** to answer or otherwise respond to the Complaint.

**IT IS SO ORDERED**.

Dated September 25, 2024, in Kansas City, Kansas.

                                        **S/ John W. Lungstrum**
                                        **JOHN W. LUNGSTRUM**
                                        **UNITED STATES DISTRICT JUDGE**